IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Chief Judge

Civil Case No. 04-cv-01258-LTB-BNB

STUDENT MARKETING GROUP, INC.,

      Plaintiff,

v.

COLLEGE PARTNERSHIP, INC.,
f/k/a COLLEGE BOUND STUDENT ALLIANCE, INC.,

      Defendant.

_____

## ORDER ON MOTION IN LIMINE AND MOTION FOR SUMMARY JUDGMENT
_____

This case is before me on Plaintiff Student Marketing Group, Inc.'s ("SMG") Motion in

Limine and Motion for Summary Judgment.  In its Motion in Limine, SMG seeks to exclude the

testimony of two expert witnesses offered by Defendant College Partnership, Inc. ("CPI"). In its

Motion for Summary Judgment, SMG seeks judgment in its favor on CPI's counterclaims for

breach of contract, negligent misrepresentation, and concealment, and on its underlying claim

against CPI for breach of contract.  After consideration of the motions, related pleadings, the

case file and the hearing August 17, 2005, I GRANT in part and DENY in part Plaintiff's

Motion in Limine, and GRANT Plaintiff's Motion for Summary Judgment, for the following

reasons.

### I.  Background

SMG is a marketing company that maintains a database containing names and addresses

of children, high school students and college students.  CPI is an education and career

preparation company that provides products and services to college-bound high school students. CPI uses direct-mail advertising to promote its products and services to high school students. In May of 2002, SMG and CPI entered into a List Rental Agreement (the "Rental Agreement") for a period of one year. Under the Rental Agreement, SMG was to provide CPI with monthly lists of names and addresses totaling up to 7.2 million records in exchange for monthly payments of $25,000. In May of 2003, SMG and CPI entered into a List Rental Renewal Agreement (the "Renewal Agreement") for an additional one year period. The Renewal Agreement required SMG to provide CPI with monthly lists of names and addresses totaling up to 9 million records in exchange for monthly payments of $38,625. (The two contracts together will be referred to herein as "the Agreements.")

As the expiration of the Renewal Agreement approached, CPI expressed dissatisfaction with the quantity and the quality of the mailing lists SMG provided and refused to pay SMG's final three invoices. SMG sued CPI for breach of contract. CPI counterclaimed for breach of contract, negligent misrepresentation and concealment. CPI asserts that SMG did not provide the number of names required under the contract and did not provide the quality of names it had promised in its promotional brochures. SMG filed a motion for summary judgment on CPI's counterclaims and on its own claim for breach of contract. CPI conducted an internal audit of its records to demonstrate that SMG failed to meet its commitments. CPI has offered the individuals involved in this audit as expert witnesses. SMG has filed a motion in limine to exclude the testimony of CPI's proposed expert witnesses.

## II. Applicable Law

For the purposes of the motion in limine, I apply the Federal Rules of Evidence and the

case law interpreting them. Since this is a diversity case, for the substantive contract and tort claims in the motion for summary judgment, I apply Colorado law.

### III.   Motion in Limine

A.   Proposed Testimony

CPI proffered two experts in support of its counterclaims, Nathan Allen and Thomas Hiller, to testify that SMG failed to provide either the quantity or quality of names SMG was required to provide under the Agreements.   Nathan Allen is a computer programmer specializing in direct mail marketing and data processing. (Def. Response to Pl. Motion in Limine Page 2.)  Thomas Hiller is a professional in the field of direct mail marketing, data acquisition, mail list management and information management. (Def. Response to Pl. Motion in Limine Page 3.)

Allen analyzed CPI's mailing list data base to "compile statistics on the quality, deliverability and duplication found within the Student Marketing Group lists that were provided to College Partnership." (Motion in Limine, Exhibit 8, Letter from Nathan Allen to Rosemary Orsini, January 14, 2005  Page 1).  Allen analyzed over 8 million records from various sources, (*Id.*, Page 2), including 1.3 million records from SMG (Allen Dep., Pages 74-75). Allen analyzed lists CPI used in actual mailings conducted over a 23 week period in 2004 (Hiller Aff. ¶ 4). Allen used a program called SoundEx to convert the names into a mailing list database, (Allen Letter to Orsini February 9, 2005 Page 1), and then provided Hiller the results of his work. (Hiller Aff. ¶¶ 5-7).  Allen's report purports to show, for each list in CPI's database, the number of correct and incorrect addresses and the number of duplicate addresses. (Allen letter to Orsini February 10, 2005 Page 2). Allen proposes only to testify to the methodology he applied to the

data he received from CPI, and to the statistical results of that work. (Allen Dep. Pages 13-14). Allen does not propose to offer any specific opinions about the reliability or accuracy of the names SMG provided to CPI (Allen Dep. Pages 17-20).

Hiller reviewed and further analyzed Allen's data to ascertain both the relative and absolute number of duplicate and incorrect addresses contained in each vendors' mailing list. (Hiller Aff. ¶¶ 4-7).  Hiller concluded that the lists SMG provided to CPI were the worst performing of the lists in CPI's database (Hiller Dep. Pages 17-18). Hiller also reviewed SMG's marketing material and analyzed them based on his general knowledge of mailing list management techniques. Hiller concluded that SMG's statements regarding the accuracy of its list are "misleading," and "not what compilers and marketers do as a standard practice."  (Hiller letter to Orsini January 12, 2005 Page 2.)

B.     Standard of Review

Under Fed. R. Evid. 104(a), I determine the admissibility of expert testimony as a preliminary matter. I must determine whether a proffered witness is qualified, whether his testimony is reliable, and whether it is relevant to the issue at hand. The proponent of expert testimony bears the burden of showing that its proffered expert's testimony is admissible. *Ralston v. Smith & Nephew Richards, Inc.,* 275 F. 3d 965, 970 (10th Cir. 2001). The proponent must make a *prima facie* showing that:

> 1) the witness is qualified to render the proffered opinions;
> 2) the opinions are based upon scientifically valid reasoning or methodology; and
> 3) the opinions apply to the facts at issue in the case.

Fed. R. Evid 702.

Determination of the admissibility of an expert opinion is not subject to rigid criteria, and

is case specific, granting me "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999). However, I am always mindful that "vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. . . These conventional devices, rather than wholesale exclusion under an uncompromising general acceptance test, are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702." *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579. 596 (1993).

    1.    Qualifications

I determine whether an expert is qualified by "comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness' testimony." *Carroll v. Otis Elevator Co.,* 896 F.2d 210 212 (7th Cir. 1990). "Personal knowledge or experience" is a valid basis for qualification. *Kumho Tire, supra,* 526 U.S. at 150. However, a witness relying solely or primarily on experience "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed R. Evid. 702 Advisory Committee's note. In this case, SMG does not directly challenge the proposed experts' qualifications.

    2.    Reliability

To be admissible, a qualified expert witness' testimony must be "based upon sufficient facts or data," "the product of reliable principles and methods," and these principles and methods must be applied "reliably to the facts of the case." Fed. R. Evid. 702.  Admissible expert testimony must be based on "actual knowledge and not 'subjective belief or unsupported

speculation.'" *Hollander v. Sandoz Pharmaceuticals Corp.,* 289 F.3d 1193, 1205 (10th Cir. 2002).  The proponent "need not prove that the expert is indisputably correct or that the expert's theory is 'generally accepted' in the scientific community. Instead, the [party] must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements." *Mitchell v. Gencorp, Inc.,* 165 F.3d 778, 781 (10th Cir. 1999).

The analysis of reliability may apply to the expert's data, the expert's method or to the expert's application of the method to the data.  "Under *Daubert*, any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible.  This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Mitchell, supra,*165 F.3d at 782 (*quoting In re Paoli RR Yard PCB Litigation,* 35 F.3d 717, 745 (3d Cir. 1994.)

3.      Relevance

To be admissible, expert testimony must also be relevant to the task at hand. *Bitler v. A.O. Smith Corp.*, 400 F. 3d 1227, 1233 (10th Cir. 2005) (*quoting Daubert,* 509 U.S. at 597.)  A trial court must look at the logical relationship between the evidence proffered and the material issue that evidence is supposed to support to determine if it advances the purpose of aiding the trier of fact. *Bitler, supra,* 400 F.3d at 1233.  Plaintiff here does not genuinely contest that the proposed testimony is relevant to the issue of the quality of the mailing lists SMG provided to CPI.

4.      On the Record Findings

In ruling on the admissibility of expert testimony, a district court must "vigilantly make

detailed findings to fulfill the gatekeeper role crafted in *Daubert.*" *Dodge v. Cotter Corp.,* 328 F.3d 1212, 1226 (10th Cir. 2003).  This means I must carefully describe and analyze the issues presented by both parties regarding the proffered expert testimony and make a complete record of my findings and conclusions.

C.      SMG and CPI Arguments

        The essence of SMG's motion is a challenge to the reliability of CPI's expert witnesses. SMG does not challenge the technical validity per se of the two computer programs Allen used to analyze the CPI data.  Rather, SMG challenges both the reliability of the data CPI's experts used and the method they applied to the data to conclude that SMG's lists were not 98% accurate. SMG similarly asserts that Hiller's assessment of SMG's marketing material is based neither on reliable facts nor on reliable methodology.  CPI's expert testimony consists of two basic components: the analytic report prepared by Allen and then further analyzed by Hiller, and Hiller's review of SMG's promotional material.

        1. Allen's Analytic Report

        SMG makes several specific assertions attacking the reliability of Allen's analytic work. First, SMG contends that the names Allen analyzed were not in fact the actual lists SMG provided to CPI, but were altered or manipulated by CPI and its contractors when it integrated its various mailing lists.  Allen was provided names from CPI via CPI's mail house, PrimeNet. (Hiller Aff. Para 7.) According to CPI officials, PrimeNet removed duplicate names and addresses, checked that the addresses were deliverable and assigned a reservation code to enable CPI to track the vendor source of each name. *Id.*  Hiller in his deposition stated that he had detected potential inaccuracies in the way PrimeNet coded the lists, possibly assigning the wrong

source to names. (Hiller Dep. Pages 25-26).   SMG claims that these changes to the database make it an unreliable surrogate for the actual names SMG provided to CPI.

CPI agrees that PrimeNet performed these modifications and that Allen and Hiller reviewed the list as modified by PrimeNet, not as provided by SMG. However, CPI contends that these alterations would tend to understate the flaws in SMG's lists and do not fundamentally undermine its validity as a proxy for the actual names SMG sent CPI. (Defendant's Response to Plaintiff's Motion in Limine, Page 4). Further, CPI asserts that it no longer has access to the original names, since the names as modified by PrimeNet are the actual names CPI used. (Defendant's Response, Page 4.)  While Hiller in his affidavit states that there is no indication that Allen's work altered reservation number assignments, CPI does not address Hiller's deposition testimony that PrimeNet's manipulations may have created inaccurate reservation numbers, and undercounted the number of accurate names SMG provided to CPI.  Neither party estimates the impact of PrimeNet's changes on Hiller's conclusions about the quality of SMG's lists, thus inserting an unknown error rate into the analysis.

Second, SMG claims that Allen's analysis is unreliable because he used a December 2004 address database to analyze a January 2004 mailing list.  Allen used a CASS software program to determine the number of incorrect addresses on the list segment he reviewed. The CASS system uses a database of Postal Service validated addresses updated monthly (Hiller Dep. Pages 122-124.)  Allen performed his analysis in December 2004 on a set of names SMG provided to CPI in December 2003 and January 2004.  (Allen Dep. Pages 42-44).  Both Allen and Hiller acknowledged that this process would overstate the number of incorrect names identified in the mailing list (Allen Dep. Pages 42-44; Hiller Dep. Pages 124-126). Allen said it

would misstate the number of incorrect names "because people move." (Allen Dep. Page 43.)

Neither Allen nor Hiller could estimate the extent of this potential overstatement, another

unknown error rate. However, Hiller's report critical of SMG's 98% accuracy claim relies in part

on SMG performing only quarterly, rather than monthly address updates. Hiller asserts that 3.9%

of the population moves on average every quarter, so a quarterly address update cannot credibly

make a list 98% accurate. (Hiller letter to Orsini January 12, 2005 Page 2.)  If this is correct, then

Allen's use of a CASS database as much as eleven months mis-matched with his underlying

database will significantly overstate the number of incorrect addresses. CPI responds that any

mismatch based on misapplying the CASS database would create an error only in an "unusual

hypothetical" case; for example, "if a building were demolished." (Defendant's Response, Page

7). CPI provides no authority for this statement.

Third, SMG asserts that Allen and Hiller rely on a CASS failure rate to estimate the

number of SMG's undeliverable addresses, and incorrectly assume that a CASS failure rate is

equivalent to an undeliverable address.  SMG maintains that an address that fails CASS

certification may still be deliverable.  CPI does not address this issue, but Hiller in his deposition

acknowledges that a CASS error is not necessarily an undeliverable address. (Hiller Dep. Page

57).  Hiller does not offer an estimate as to what percentage of CASS failures are in fact

undeliverable.

Fourth, SMG claims that the sample of names Allen and Hiller analyzed was too small

and unrepresentative to reliably represent the names SMG provided CPI.  Hiller and Allen

analyzed a total of over 8 million names from all of CPI's vendors, comprising CPI's actual

mailings during a 23 week period in 2004. (Hiller Aff. ¶ 4.) Of these, 1.3 million records were

from SMG.  CPI states that this is a sufficient sample to generalize for the 8.4 million records

SMG provided CPI during the 12 month period covered under the 2004 Renewal Agreement.

Neither party offers any evidence regarding the validity or invalidity of using this sample size.

Fifth, SMG argues that due to various flaws in its methodology CPI severely

undercounted the overall number of records and the number of good records assigned to SMG.

PrimeNet's list coding process assigned multiple codes to two of CPI's vendors: ASL and SMG.

ASL was assigned seven codes and SMG was assigned two codes. (Allen Dep. Pages 116-121).

According to Allen, his duplicate analysis would only register duplicates within a code; not

among codes. So the same address in two different ASL codes or two different SMG codes

would not be counted as a duplicate.  *Id.*  SMG also claims that CPI gave ASL "credit" for all

names common to SMG and ASL, (Russell Dep. Pages 27-29) and that CPI's expert's analyses

did not accurately track mailings sent for test purposes (Russell Dep. Pages 30-32).   CPI

responds that the flaw in counting duplicates among codes would tend to undercount SMG's

duplicate addresses, not to overstate them. SMG responds that it would tend to overstate them in

comparison to ASL's duplicate list. CPI does not respond to SMG's other claims about flaws in

Allen's methodology.

Sixth, SMG contends that Allen's inexperience with the computer program he used to

run CPI's analysis undermines the reliability of his report.  Allen acknowledged that he had

never used the SoundEx program in a project, and that he only selected it for this project because

his boss (not affiliated with CPI or with this litigation) selected it for him. (Allen Dep. Pages 35-

38). Allen further testified that his experience with SoundEx consisted of an assignment in a

class several years earlier and "messing around with it" on his computer at home "to see what it

would do." *Id.* Allen has no independent knowledge of the validity of this program for sorting

duplicate names from a mailing list, and is unaware of anyone else who has used it for this

purpose. *Id.* Allen is also unaware of the program's error rate. (Allen Dep. Page 111). CPI

responds that SoundEx is a valid program widely used by the U.S. Bureau of the Census, and

that Allen is an experienced computer programmer whose duties at his direct mail marketing

firm include years running CASS certification and merge-purges. CPI does not address Allen's

specific level of experience with the SoundEx program, or the validity of SoundEx for this

specific purpose.

  2.  <u>Hiller's Review of the SMG Marketing Material</u>

  SMG argues that Hiller's analysis of SMG's marketing material is not based on scientific

or technical expertise and so is inappropriate as expert testimony.  Hiller's January 12, 2005

report is based on SMG's marketing brochure, not on SMG's actual database. (Hiller letter to

Orsini, January 12, 2005). Hiller in this letter reviews SMG's self-reported list management

methods and opines as to whether these methods can possibly achieve SMG's claim of 98%

accuracy. *Id.* Hiller acknowledges that he has no information on and did not analyze SMG's

actual list management practices. (Hiller Dep. Pages 82-86).  CPI does not address this issue.

<u>D.</u>  <u>Analysis</u>

  SMG contends that the flaws in SMG's methods and data undermine the fundamental

reliability of these experts' testimony. CPI responds that these are "hyper-technical objections"

that go to the "weight of the testimony. . . not its admissibility." (Defendant's Response to

Motion in Limine Page 1).

  The basic issue here is whether CPI's expert testimony "employs the same level of

intellectual rigor that characterizes the practice of an expert in the relevant field," *Kumho, supra,* 526 U.S. at 152, or whether this testimony is so unreliable as to fall "outside the range where experts might reasonably differ, and where the jury must decide among the view of different experts, even though the evidence is 'shaky'," *Kumho, supra,* 526 U.S. at 153.   The question is not whether the witnesses' technical approaches are per se invalid or unsupportable, but the reasonableness of using their approach and their particular methods to analyze the data they obtained and to draw a specific conclusion relevant to this case. *See id.* at 154, 155.

Applying this principle, I do not find the proffered testimony based on Allen's report to be sufficiently reliable to meet the requirements of Fed. R. Evid.  702 and *Daubert.*  While some of the issues SMG raises may be minor and appropriate for competing experts to dispute before a jury, SMG also raises basic questions as to the reliability of Allen's methods and data, rendering them inadmissible as expert testimony.

First, the data Allen and Hiller analyzed is not a reliable proxy for the lists at issue in this case. CPI's experts seek to testify that SMG's lists were not 98% accurate and performed worse than the lists of any of CPI's other vendors. Yet, CPI's experts did not analyze SMG's actual lists. They analyzed instead a list that had already been processed by SMG's mailhouse, PrimeNet. There is no factual dispute about PrimeNet's alterations to the SMG lists, but there is dispute over the impact of these changes. Some of PrimeNet's alterations of the list are likely innocuous, such as merge-purging and putting identification codes on each name. But PrimeNet made other alterations of the list that would tend to skew the experts' results. CPI's own experts acknowledge that PrimeNet may have miscoded an unknown number of records, attributing valid SMG addresses to other vendors and otherwise undercounting valid SMG addresses.

PrimeNet may have miscounted or mistabulated the number of duplicate addresses.  Lists used for special test mailings were not coded in a manner that allowed attributing the names to their source.  CPI's experts are unable to account for these flaws, and unable to estimate the extent to which they might impact their results. Hiller's affidavit states that Allen did not alter the underlying data, but does not address whether PrimeNet's changes rendered the data an unworkable proxy for SMG's lists. In effect, this means that these experts cannot vouch for the reliability of their own data.

Second, CPI's experts concede that they misapplied the CASS process by using data eleven months mis-matched to the mailing list they analyzed.  The CASS check is the basis for CPI's contention that the SMG lists were not 98% reliable. Yet, Hiller, in his critique of SMG's methods, asserts that the population on average moves at a rate of 1.3% a month and 3.9% a quarter, rendering 98% address reliability impossible using only quarterly updates. (Letter from Hiller to Orsini, January 12, 2005 Page 2). According to Allen's own testimony, the data on incorrect addresses that he provided to Hiller are based on a gap of eleven months between the date of the lists and the data of his CASS check. So, assuming the lists were 100% accurate when SMG provided them to CPI, using a CASS update eleven months later would likely mean that more than 10% of the addresses would be incorrect. In effect, Allen's review measured how accurate an SMG list is eleven months after it is provided, while the relevant inquiry is how accurate the lists are within 30 days of when they are provided, which is SMG's guarantee. Neither Allen nor Hiller address this issue.

Third, Allen, although likely a competent computer professional, is unable to vouch for the reliability of the methods he used in this case. He can offer no opinion as to the validity of

using SoundEx for this purpose. He has no information about the error rate of SoundEx. He did

not select SoundEx based on any research or even first hand knowledge, and he has no

information on whether SoundEx has ever been used for this purpose.  Hiller also does not

anywhere in the record address the reliability of using this program for this purpose.

For these reasons I find and conclude that the analysis conducted by Allen is

insufficiently reliable to be used as expert testimony. Allen's report, and therefore Allen's

testimony, must be excluded, and Hiller's testimony that is based on his analysis of Allen's

report must also be excluded.

Hiller's testimony on the SMG brochure is not based on Allen's analysis but on his own

personal knowledge of industry practices and methods. While an expert's testimony on personal

experience can be valid, the expert must explain "how that experience leads to the conclusions

reached, why that experience is a sufficient basis for the opinion and how that experience is

reliably applied to the facts." Fed. R. Evid. 702 Advisory Committee's note. Applying this

standard here, I have serious misgivings about  Hiller's testimony. Hiller concedes he has not

investigated SMG's actual list management practices and has no knowledge or opinion of the

actual reliability or accuracy of SMG's lists.

Hiller's lack of investigation is not fatal to this limited testimony.  Since SMG does not

challenge Hiller's credentials as an expert in the field of list management, SMG in effect is

stating that Hiller's offer to analyze the promises of the brochure against the list management

practices stated in the brochure is per se invalid because Hiller did not undertake any other

investigations to ascertain SMG's list practices.  I find this unpersuasive. As long as Hiller does

not testify on Allen's analysis and report (which claims to show that SMG did not deliver 98%

14

accurate lists), Hiller may testify, based on his unchallenged expert experience, on whether SMG

can possibly deliver on this promise. Addressing this issue does not require exhaustive analysis

of SMG's records. Further, the kinds of issues that SMG raises to challenge the credibility of this

testimony, such as whether Hiller based his conclusion on a national average move rate or a

move rate specific to high school students, is within the range of experience of an average juror.

*See Kumho Tire, supra*, 526 U.S. at 153. I therefore find and conclude that Hiller's testimony as

to the validity of the claims in SMG's brochure, based on Hiller's knowledge of industry

practices, is not excluded as unreliable.

### III.    Motion for Summary Judgment

A.    <u>Standard for Review</u>

The purpose of a summary judgment motion is to assess whether trial is necessary.

*White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). I shall grant summary judgment if

the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no

genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the

governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The

non-moving party has the burden of showing that there are issues of material fact to be

determined. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A party seeking summary

judgment bears the initial responsibility of informing the district court of the basis for its motion,

and identifying those portions of the pleadings, depositions, interrogatories, and admissions on

file together with affidavits, if any, which it believes demonstrate the absence of genuine issues

for trial. *Id.* at 323; *Mares v. ConAgra Poultry Co.*, 971 F.2d 492, 494 (10th Cir. 1992). Once a

properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980); Fed. R. Civ. P. 56(e). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the pleadings themselves." *Celotex, supra,* 477 U.S. at 324.

If a reasonable juror could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial. *Id.* at 323. The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. *Anderson, supra,* 477 U.S. at 250. However, I should not enter summary judgment if, viewing the evidence in a light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Id.* at 252; *Mares, supra,* 971 F.2d at 494. Moreover, a court may not consider "evidence" that is merely hearsay or general opinions unsupported by fact. *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995).

B.     Analysis

1. CPI's Counterclaim for Breach of Contract

SMG claims that CPI breached the Renewal Agreement by failing to make its final three payments. CPI claims that SMG breached the Rental Agreement and the Renewal Agreement by failing to provide either the prescribed quantity or quality of names. Specifically, CPI asserts that SMG did not provide 9 million names as required under the Renewal Agreement, and did not provide names that were 98% reliable and the best in the industry as SMG stated in its

promotional brochures.  CPI contends that under the Renewal Agreement it was obliged only to

pay SMG for each valid record it received on a per record basis, and that even absent its last

three payments it has paid SMG the required rates for the number of records it actually received.


      a.      Quantity and Price of Names

SMG argues that CPI's claims regarding the quantity of the records it owed CPI overstate

its obligations under the plain terms of the Agreements. SMG asserts that the Renewal

Agreement required SMG to provide "up to 9 million records," (Renewal Agreement, Section

1.A.), so SMG cannot be in breach of contract for failing to provide precisely 9 million records.

SMG contends that the Renewal Agreement required SMG to provide all of the names CPI

requested "up to a maximum of 600,000 High School Records . . . each month . . . on an as

needed basis." (Renewal Agreement, Section IV.A.)  The Renewal Agreement also states that

SMG currently owns 5.7 million records, and anticipates compiling an additional 1 - 2 million

names by June of 2004. (Renewal Agreement, IV(C)).

SMG claims, and CPI does not contest, that SMG provided 7,473,910 records under the

Rental Agreement and 8,494,066 records under the Renewal Agreement. (Stumacher Aff. ¶ 12.)

SMG asserts, and CPI does not contest, that it provided all of the records CPI requested each

month. (Russell Dep. Pages 15-16).   SMG further argues that the Renewal Agreement does not

require payment per record, but requires CPI to make 12 monthly payments of $38,625.

(Renewal Agreement V.A.)

The Renewal Agreement is not as clear as SMG suggests. The Renewal Agreement states

that CPI shall pay SMG "the sum of $0.0515 per high school record, payable in twelve monthly

payments of $38,625 each..." (Renewal Agreement Section V.A.) This per capita price works out to this monthly fee only if SMG provides 750,000 names per month, or 9 million names per year.  Although SMG claims that this per record price applies only if SMG provides CPI with more than 9 million records, (Stumacher Dep. Pages 179-180), the Renewal Agreement contains no language that supports such an interpretation.

This lack of clarity in the contract's terms requires me to review evidence outside of the contract itself to discern the true intent of the parties. Where a contract's terms are ambiguous, parol evidence may be used to clarify unclear or uncertain terms. *Lazy Dog Ranch v. Telluray Ranch Corp.,* 965 P.2d 1229, 1237 (Colo. 1998). Parol evidence may include the parties' course of business dealings. C.R.S. § 4-2-202(a).  Here, there is no genuine dispute that the parol evidence supports SMG.  SMG billed CPI monthly for $38,625 for 12 months, and CPI paid nine months of invoices, before CPI raised any concerns about the price, quantity or quality of the names. (Grace Dep., pages 48-49).  CPI knew it was billed at a flat rate, and did not raise any issues (Anderson Dep. Page 199).  CPI was aware that the SMG contract, unlike contracts with other vendors, was for a "fixed figure." (Anderson Dep. Page 199).  CPI's President, Jack Grace, understood that 7.2 million names and 9 million names were the maximums under the respective agreements, and that CPI would have to pay more for additional names. (Grace Dep. Page 79-80).

CPI's sole evidence that SMG was obliged to provide 9 million records is a letter from SMG's President, Jan Stumacher, describing the Renewal Agreement as providing "50% more names (6M v. 9M)" than the Rental Agreement, and stating that the "price per thousand is the same" between the two agreements. (Defendant's Response Brief, Exhibit D, Stumacher letter of

April 20, 2004.)  This letter does not present a fact issue regarding the quantity of names because it does not purport to guarantee a figure different from the one in the Renewal Agreement. The reference to a 50% increase is based on an incorrect statement that the prior Rental Agreement called for a maximum of 6 million names, when in fact it called for a maximum of 7.2 million names. (Stumacher letter, April 20, 2004, Page 1). Since no one disputes that the Renewal Agreement called for 9 million names, I do not find Stumacher's factual mistake regarding the Rental Agreement to present an issue of material fact on the later Renewal Agreement.

The evidence in the record therefore does not present a fact issue regarding the quantity of names SMG was required to provide CPI under the Agreements.

B.      Quality of Names

CPI argues that SMG breached a contractual commitment to provide lists 98% accurate, as promised in SMG's promotional brochures. SMG asserts that the Agreements identify SMG's full commitments regarding the quality of the names. Section VII of the Agreements states in part:

> "The High School records furnished to Lessee have been obtained from sources considered to be reliable.  However, due to the possibilities of errors inherent in the procurement and compilation of data involving a large number of individuals, neither the accuracy nor the completeness of the information provided to lessee is guaranteed."

SMG also contends that any evidence of prior dealing or negotiating is not part of the Agreements because the Agreements are fully integrated. Section XX of the Agreements reads in relevant part: "This Agreement . . . constitute(s) the entire agreement between the parties hereto and supersedes all previous agreements and understandings whether oral or written, express or implied. . . ."

CPI offers several reasons why the promises in the brochures do bind SMG, despite this language.  CPI asserts that the language in Section VII quoted above refers only to factual information provided about each student (their age, grade level and whether the student is college bound) but not to the accuracy of the students' addresses or to the presence of duplicate names. (Defendant's Response Brief pages 10-11.) CPI provides no evidence to support this interpretation of the Agreements.

CPI, citing *Lutz Farms v. Asgrow Seed Company*, 948 F.2d 638 (10th Cir. 1991), argues that a contract's general waiver provision cannot disclaim a seller's promises contained in promotional material where those promises induced the buyer to form the contract.  In *Lutz Farms*, a seed merchant's inconspicuous warranty disclaimer contained in a post-sale confirmatory invoice did not release the seller from earlier promises made to customers in its promotional materials.  *Id.*  at 646.  The facts here are different.   The warranty language is in the written contract itself, is in bold letters, and the specific word "merchantability" is used in the disclaimer. (Renewal Agreement, Section VII; Rental Agreement, Section VII.)   *Lutz Farms* does not support CPI's argument.

CPI next argues that the parol evidence rule does not bar evidence of a promise or inducement to form or execute a contract, citing *Cantrell v. Lemons,* 200 P.2d 911, 912 (Colo. 1948).  However, this exception to the parol evidence rule applies only where the contemporaneous promise does not "relate directly to the subject matter of the contract" and where "such promise is not inconsistent with the provisions of the written contract." *Id.  See also Stevens v. Vail Associates*, *Inc.,* 472 P.2d 729, 731 (Colo. App. Ct. 1970). Here, there is no question that the subject matter of the brochure is the same subject matter as the contract and not

a collateral matter.

Finally, CPI asserts that even if the contract language bars evidence of SMG's promises of 98% accuracy, the Renewal Agreement still requires SMG to provide "new or updated duplicate High School records." (Renewal Agreement IV. B.) CPI argues that this term is not defined in the Renewal Agreement, and that parol evidence is admissible to clarify what these terms mean. CPI contends that SMG did not provide new or updated records, but only the same records on multiple occasions.  The parol evidence in the record, however sheds no light on what the term "new or updated" means. Even assuming that SMG must change or update each record in each monthly delivery, CPI has provided no evidence that SMG failed to do this.  The data and records CPI has provided attempt to address SMG's overall accuracy or duplication rate, but do not address whether or to what extent SMG failed to update its records each month. Thus, the record before me offers no disputed facts indicating that SMG failed to meet its quality commitments under the Agreements.

### 2.  CPI's Claim for Negligent Misrepresentation

Negligent misrepresentation consists of negligently providing false information, for the guidance of others in their business transactions, when the misrepresentation causes others to justifiably rely to their detriment.  *Keller v. A.O. Smith Harvestore Products, Inc.,* 819 P.2d 69 (Colo. 1991) (*quoting Restatement (Second) of Torts* (1965) § 552(1)). The plaintiff must show that his reliance on the misrepresentation was reasonable. *Bloskas v. Murray,* 646 P.2d 907, 914-915 (Colo. 1982.)  The misrepresentation must be as to an existing or past fact, not to a promise for future performance. *Branscum v. American Community Mutual Ins. Co.,* 984 P. 2d 675, 680 (Colo. App. Ct. 1999).  A statement of opinion cannot support a claim for misrepresentation.

*Mehaffy, Rider, Windholz & Wilson v. Central Bank,* 892 P.2d 230 (Colo. 1995).

CPI asserts that SMG made false statements as to the quantity and quality of names in its lists and that CPI relied to its detriment on these representations when it signed the Agreements with SMG. (Counterclaims, ¶¶ 50-60.)

SMG argues that a claim for negligent misrepresentation is barred as a matter of law in a breach of contract claim.  SMG contends that the integration clause, the warranty clause and the limitation on damages clause, taken together, rule out a claim for negligent misrepresentation.  I disagree. In Colorado, "a general integration clause does not effect a waiver of a claim of negligent misrepresentation not specifically prohibited by the terms of the agreement." *Keller, supra,* 819 P.2d at 73.  "A contract provision purporting to prohibit a party to the contract from asserting a claim of negligent misrepresentation must be couched in clear and specific language." *Id.* at 74.  Here, the Renewal Agreement's integration clause is similar to the provision in *Keller,* and standing alone cannot prevent a claim for negligent misrepresentation.

SMG next argues that even where a general integration clause does not bar a claim for negligent misrepresentation, a contract's release provision may.  *Brooks v. Timberline Tours, Inc.,* 127 F.3d 1273, 1276 (10th Cir. 1997). While correct as a statement of law, this does not help SMG.  The Renewal Agreement's Limitation of Liability section (Renewal Agreement Section VIII B) refers only to "consequential, incidental, indirect, special or punitive damages."  It does not address direct damages. In *Brooks,* the language was more sweeping and specific, releasing the defendant from "any and all liability, claims, demands, actions or rights of action. . . related to or in any way connected with my participation in this activity . . . including the negligent acts of (the defendant)." *Id* at 1274.  I conclude that the Agreements do not bar CPI's claim of

negligent misrepresentation as a matter of law.

I turn then to whether CPI has raised an issue of material fact sufficient to defeat a motion for summary judgment for each of SMG's alleged misrepresentations.

a.      Alleged Misrepresentations as to Quantity of Names

First, I address the alleged misrepresentations as to the quantity of names. CPI asserts that SMG misrepresented that it would provide 7.2 million names under the Rental Agreement and 9 million names under the Renewal Agreement; and in fact did not provide these quantities of names. But as discussed above, the Agreements called for a maximum of 7.2 and 9 million names.  CPI has produced no fact showing that SMG promised to provide precisely this number of names. So, SMG's failure to provide precisely this amount of names cannot justify a claim of negligent misrepresentation.

Second, CPI contends that SMG was unable to provide this maximum number, and was aware that it could not at the time it entered the Agreements. (Counterclaims, ¶ 54). The Renewal Agreement states that SMG represents that it "currently owns 5.7 million High school records and anticipates compiling an additional 1-2 million records by June 2004." (Renewal Agreement IV.C.) This contract language specifically addresses the number of names SMG represents that it had in its possession at the time of the signing of the Renewal Agreement. CPI's own witnesses have testified that lists were to be used more than once (Russell Dep. pp 38-40), and CPI's President, Jack Grace, has stated that he was unsure whether the 9 million figure represented unique or multiple names (Grace Dep. Page 43).  CPI has thus provided no evidence creating an issue of material fact on SMG's representations about the size of its database.

Third, CPI argues that SMG stated falsely that the Renewal Agreement would provide 50% more names than the Rental Agreement.  CPI offers as evidence Grace's recollection that SMG's President, Jan Stumacher, told him during negotiations that the Renewal Agreement would contain 50% more names than the Rental Agreement (Grace Dep. Page 14), and the Stumacher letter discussed above. Neither of these assertions presents an issue of fact supporting misrepresentation.  The letter is dated April 20, 2004, eleven months after CPI signed the Renewal Agreement. CPI could not have relied upon it in signing the Renewal Agreement on May 19, 2003.

Stumacher's alleged promise to Grace that the Renewal Agreement would provide 50% more names than the Rental Agreement (Grace Dep. Page 42) is similarly unpersuasive.  The fact at issue here is not whether the contract would provide 9 million names (since Grace, Stumacher and the contract all agree on this figure), but whether Stumacher made an independent commitment to a 50% increase in names beyond the 9 million. In fact, Grace's own testimony shows that he believed the 50% increase presumed that the Rental Agreement promised 6 million names when in fact it provided a maximum of 7.2 million names. (Grace Dep. Pages 42-44).  The Stumacher letter makes the same error. Since Stumacher and Grace were both capable of reviewing the Rental Agreement to see that it provided for a 7.2 million maximum, and both were parties to the Renewal Agreement calling for a 9 million maximum, and both were capable of doing the math to show that 9 million is not a 50% increase over 7.2 million, I cannot find this error in arithmetic to constitute a material fact sufficient to be a basis for a claim of misrepresentation.

B.      Alleged Misrepresentations as to Quality of Names

CPI claims that SMG misrepresented that its lists were 98% accurate and that it provided prices and accuracy superior to other vendors. CPI's evidence for these statements is SMG's promotional brochure and statements on SMG's website. (Grace Dep. Page 17). The alleged misrepresentations on the website have not been provided as evidence, and have not been testified to by any witness. Grace did not view the website (Grace Dep. Page 21)and CPI has not provided the testimony of any employee who did.  The alleged website information therefore cannot present a fact issue of misrepresentation.

SMG does not contest the contents of its promotional brochures, and does not contest that CPI representatives read them prior to signing the contracts with SMG. The brochures read, in relevant part:

> College-Bound High School Students. High school students who intend to go to college. This list is updated continuously through the year and NCOA'd quarterly."

> (College bound High School student) Lists are updated continuously throughout the year and rented for one time use only, unless agreed upon in writing. Our . . . College-bound high school student lists are guaranteed to be 98% accurate.

> Guarantee of deliverability . . . No list can be 100% accurate due to constant changes in the population. Each list is guaranteed separately as indicated in this catalog.  Student Marketing Group will refund 15 cents for each piece of undeliverable mail in excess of the guarantee as long as the list is mailed within 30 days of the date you receive the files. The undeliverable mail pieces must be returned to Student Marketing Group within 90 days of our shipping date. Telephone numbers and email addresses are not guaranteed.

> Student Marketing Group has done everything in its power to ensure the accuracy of its lists, but we do cannot guarantee the success of your mailing.  We are not liable for any damages sustained through the use of our lists and in no event shall our liability exceed the cost of the list.

> (Plaintiff's Motion for Summary Judgment, Exhibit 1.C. "Student Marketing Mailing Lists and Marketing Services")

We pride ourselves in maintaining the most accurate and cleanest list on the market.

(Defendant's Response to Plaintiff's Motion for Summary Judgment, Exhibit G, "Reach Your Most Responsive Market: Succeed with Student Marketing Group.")

The last statement -- on maintaining the most accurate and cleanest list on the market – is a statement of opinion and cannot be the basis for a claim of misrepresentation. The statements regarding 98% list accuracy, however, are statements of fact, and may be the basis for such a claim. CPI has offered evidence showing that SMG did promise 98% list accuracy, that CPI relied on this statement in contracting with SMG (Grace Dep. Page 16) and, viewed in the light most favorable to CPI, that SMG's lists were not in fact 98% accurate (Hiller Dep. Pages 82-90). This makes out a *prima facie* case to defeat summary judgment on misrepresentation. SMG has offered several arguments to defeat CPI's claim.

SMG argues that CPI could not have reasonably relied to its detriment on the 98% promise because of the integration clause and the warranty disclaimer discussed above. SMG cites to *Branscum v. Am. Mut. Ins. Co.,* 984 P.2d 675, 679 (Colo. Ct App. 1999) for this proposition. I find SMG's argument unpersuasive. As discussed above, a general integration clause by itself is insufficient to bar a claim of misrepresentation. *Keller, supra,* 819 P.2d at 69. SMG contends that a specific contract provision addressing future performance can bar a claim for oral misrepresentation regarding that specific future performance. *Branscum, supra,* 984 P.2d at 679. In *Branscum,* an oral promise by an agent of an insurance company regarding a future event was not a misrepresentation, where that specific future event was explicitly identified in the contract in a manner directly contrary to the oral representation. But those are not the facts of this case. SMG's brochures address both the status of the lists as they exist at the time of the

contract signing and SMG's commitment to maintain those lists to ensure 98% accuracy. The disclaimer in the Agreements is too vague and general to overcome these more specific claims in SMG's brochures.

SMG next argues that CPI has provided no admissible evidence that its lists were not in fact 98% reliable. SMG contends that the proffered expert testimony is unreliable and therefore inadmissible under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).  It is important to stress here that CPI proffers expert testimony on two related but distinct claims.  CPI asserts that SMG's lists did not in fact perform at 98% reliability, and that based on SMG's own list management practices could not have performed at this level. In my discussion of SMG's motion in limine, above, I disallowed CPI's proffered testimony analyzing CPI's database to make conclusions about SMG's lists, but I allowed Hiller's testimony as an industry expert on the level of accuracy SMG's own stated list management practices could possibly achieve.  Thus, it is necessary to analyze whether Hiller's testimony on the brochure is sufficient to raise an issue of material fact to defeat summary judgment on whether SMG misrepresented the quality of its lists.

Here is where CPI's argument founders. The promise of 98% list accuracy is part of a guarantee to return undeliverable mail in excess of 2%. SMG asserts, and CPI does not deny, that CPI did not take advantage of this return refund offer. Hiller testified that SMG's guarantee, taken in its entirety, is not misleading and would not be misleading to companies in the industry. (Hiller Dep. Pages 95-96 ).  There is no dispute that CPI is a company in the industry. Nevertheless, CPI argues that it relied on SMG's brochure. As a matter of law, such a reliance is unreasonable, because, according to CPI's own expert witness, the statement would not be

misleading to such a company. Even if Hiller's testimony raises an issue of fact regarding whether SMG's lists were in fact 98% accurate, his own testimony defeats the element of reasonableness essential in a claim for negligent misrepresentation.

Moreover, Hiller's testimony as a whole points but one way.  The only meaningful proxy for list accuracy is the list's actual deliverability, and Hiller states explicitly that he cannot render an opinion on the actual deliverability of SMG's lists.  Hiller states that in evaluating the validity of SMG's claims, or the claims of any vendor of mailing lists, the essential issue is whether mail sent to the list can be delivered. (Hiller Dep. Pages 91, 111-112.)

The factors and processes on SMG's brochure that Hiller evaluates may be suggestive of actual deliverability, but do not necessarily define actual deliverability.  Hiller testifies that there is no industry standard for either the form or the frequency of list updating. (Hiller Dep. P. 89). Hiller states that deliverability depends on whether a piece of mail is sent first class, third class or with some other endorsement. (Hiller Dep. Pages 93-94).  Hiller confirms that a CASS failure does not necessarily mean a piece of mail is undeliverable. (Hiller Dep. Page 57).  Hiller states that a list's actual deliverability may vary based on whether people who have moved have filled out a change of address form. (Hiller Dep. Pages 90-91).  Furthermore, Hiller's own analysis shows that the SMG list had less than 2% true duplicates, the closest approximation to actual undeliverable mail. (Hiller Dep. Pages 74-76.) At the same time, Hiller testifies that he has not evaluated and has no opinion on the actual deliverability of SMG's lists. (Hiller Dep. Page 86).

Ultimately, then, Hiller's testimony taken as a whole is that he cannot tell, based on the brochure, if SMG's lists are or are not 98% deliverable. Also, he has no opinion on the actual deliverability of SMG's lists.  This means that his testimony does not address the core issue of

misrepresentation. Thus, Hiller's testimony on the brochure, even though it is reliable enough to survive a *Daubert* challenge (see discussion in III. D. above) fails to raise an issue of material fact sufficient to defeat summary judgment on the claim of misrepresentation.

### 3. CPI's Claim for Concealment

To prevail on a claim for fraudulent concealment, a plaintiff must demonstrate that the defendant failed to disclose a past or present fact that he or she had a duty to disclose, with intent to induce the plaintiff to take a course of action he or she would not otherwise have taken, and that the plaintiff justifiably relied on the omission. *Wisehart v. Zions Bancorporation*, 49 P.3d 1200, 1204 (Colo. Ct. App. 2002). Direct evidence of each element is not always required because fraud may be inferred from circumstantial evidence. *Id.* at 1206.

CPI alleges that SMG concealed that: (1) it was not able to deliver 7.2 million records under the Rental Agreement, or 9 million records under the Renewal Agreement; (2)  SMG was unable to deliver the records in a timely fashion to CPI; (3) the records were inaccurate or unreliable; (4) the records were not of a higher quality or more accurate than competitors' records; (5) the names contained falsely manufactured, duplicate, similar or incorrect names and addresses; and (6) SMG's rates were not reasonable or competitive in the industry.  (CPI Counterclaims, ¶ 64.) CPI also claims that SMG concealed that it never intended to provide the 7.2 million and 9 million names required under the Agreements. (CPI Counterclaims, ¶ 65).

CPI has presented no evidence on the record to support these claims. As discussed above, the Agreements call for SMG to provide a maximum of 7.2 million names and 9 million names. CPI understood that this included duplicates, since CPI requested the same record more than once. (Russell Dep. Page 38.)  Since SMG was not under a contractual duty to provide 7.2 or 9

million unique names, it cannot be liable for allegedly concealing the fact that it did not provide

this number of names.  CPI also claims that SMG had a duty under the Renewal Agreement to

expand its database by 1 - 2 million names, and failed to disclose that it could not do so. But the

Renewal Agreement states that SMG "anticipates compiling 1 - 2 million additional names by

June 2004." Renewal Agreement, Section IV. C. (Emphasis added.)

CPI's evidence of concealment consists of Consent Decrees entered in December 2002

and January 2003 that require SMG to delete certain names from its database. (Defendant's

Response in Opposition to Plaintiff's Motion for Summary Judgment, Exhibits E and F.) CPI

does not explain how these Consent Decrees relate to SMG's stipulation that it possesses 5.7

million names, and that as of May of 2003 it plans to add 1 - 2 million names by June 2004.

Furthermore, SMG's President Jan Stumacher has testified that he informed SMG of these

consent decrees. (Stumacher Dep. Page 209). These Consent Decrees do not raise a material

issue of fact on the claim of fraudulent concealment.

Similarly, CPI has provided no evidence that SMG promised names of higher quality

than its competitors. The sole evidence CPI offers is a statement in an SMG brochure (above)

stating that SMG takes pride in maintaining the "cleanest and best maintained list in the

industry." This vague statement of opinion is insufficient to create a duty to disclose.

Even though CPI does not specifically refer to SMG's claim of 98% list accuracy in its

pleadings as part of its claim of concealment, (Counterclaims ¶¶ 64 and 65) this also cannot

sustain this claim. SMG's list management processes are published in the same promotional

materials that contain its promise of 98% accuracy. CPI must have been aware that SMG

asserted that it updated its lists quarterly, and was able to draw its own conclusions as to whether

30

this quarterly update could deliver 98% accuracy.

CPI's evidence of SMG's failure to meet its 98% accuracy commitment is a purported CASS failure rate of at least 5%.  (Defendant's Response to Plaintiff's Motion for Summary Judgment, Page 17). However SMG's own witnesses have stated that a CASS failure does not necessarily mean an address is undeliverable. (Anderson Dep. pp. 79-83).  SMG did not make any representations to CPI about its CASS certification rate, and so had no duty to reveal its CASS failure rate.

I conclude that CPI has not raised a material fact to defeat SMG's motion for summary judgment on the counterclaim of fraudulent concealment.

    4.        <u>Limitation on Damages and Statute of Limitations</u>

Because I grant summary judgment for SMG on CPI's counter claims, I do not address SMG's arguments on the Agreements' damage limitation provision or on the Rental Agreement's statute of limitations provision.

    5.        <u>SMG's Breach of Contract Claim</u>

The elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff.  *See Western Dist. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1999).  Neither party disputes that there was a contract present here. It is undisputed that the terms of the Renewal Agreement called for SMG to provide CPI with the lists it requested each month for a fee of $38,625. (Renewal Agreement, § V. A.), with a 10% extra charge for late payments. (Renewal Agreement § V.C.)  It is undisputed that the Renewal Agreement requires the breaching party to pay the non-breaching party's costs,

expenses and reasonable attorney fees. (Renewal Agreement § X. B.)  It is also undisputed that

SMG provided the lists as required by the Renewal Agreement and that CPI did not make its last

three payments. CPI's sole defense to SMG's breach of contract claim was its breach of contract

counterclaim. This counterclaim has been defeated on SMG's motion for summary judgment, so

there is no issue of material fact to defeat SMG's claim against CPI for breach of contract.

### IV. Damages

I find that SMG is entitled to damages of $127,462.50 plus costs and expenses, including

attorney fees.

Accordingly, **IT IS ORDERED THAT:**

1) PLAINTIFF SMG's motion in limine is GRANTED in part and DENIED in part. It is

GRANTED as to Allen and as to any testimony from Hiller based on Allen's analysis. It is

DENIED as to Hiller's analysis of SMG's marketing materials.

2) PLAINTIFF SMG's motion for summary judgment against DEFENDANT CPI on its

counterclaims for breach of contract, negligent representation and concealment is GRANTED,

and these claims are DISMISSED;

3) PLAINTIFF SMG's motion for summary judgment against DEFENDANT CPI for

breach of contract is GRANTED;

4) DEFENDANT CPI shall pay $127,462.59 in damages to PLAINTIFF SMG;

5) PLAINTIFF SMG shall submit its attorney fees and expense claim within 10 days of

this Order.

6) DEFENDANT CPI has 10 days to respond to PLAINTIFF SMG's submission of

attorney fees and expenses.

7) The Clerk of this Court shall enter judgment according to this Order in favor of

PLAINTIFF SMG against DEFENDANT CPI.

**DONE and ORDERED,** this _22nd_ day of August, 2005 at Denver, Colorado.

    s/Lewis T. Babcock
United States District Chief Judge